ROBERT W. SMITH and EVELYN E. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 10189-77.
United States Tax Court
T.C. Memo 1980-15; 1980 Tax Ct. Memo LEXIS 570; 39 T.C.M. (CCH) 900; T.C.M. (RIA) 80015; January 21, 1980, Filed Harry McNutt, for the petitioners. Wesley J. Lynes, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies of $3,685.72 and $2,117.76, respectively, in petitioners' 1973 and 1974 Federal income taxes. Because of concessions, the only issue in each year is whether certain corporate distributions made on behalf of petitioner Robert W. Smith were loans or informal dividends. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Robert W. Smith and his wife Evelyn E. Smith resided in Nashville, Tenn., when they filed their petition in this case. Robert W. Smith (hereinafter petitioner) has been in the roofing business for over 30 years. For approximately 25 years he has run his own roofing *571 company, first as the sole owner and later as the president of a corporation. Petitioner incorporated his business as Donelson Roofing Company, Inc. (Donelson) on July 1, 1972, after nearly 20 years of operating as a sole proprietorship. Donelson was initially capitalized with $1,000 for which Donelson issued 20 shares at $50 per share. Petitioner and his wife each received 10 shares. In addition, Donelson at that time acquired control of all the assets and assumed the liabilities of the sole proprietorship. According to the minutes of Donelson's annual meeting of stockholders and directors (in both cases, petitioner and his wife) held November 13, 1972, the net book value of the sole proprietorship upon incorporation was $52,238.22. [1] The minutes recite that in return for the contributed assets, Donelson executed a demand note for $3,238.22 payable to petitioner and his wife, dated July 2, 1972, and bearing 10 percent interest, and issued 980 shares of stock solely to petitioner, which at $50 per share equalled the $49,000 balance of petitioner's capital account. [2]
*572 The November corporate minutes also state that petitioner's individual proprietorship (d/b/a Donelson Roofing Co.) had been wound up and its debts paid, and that that business was closed except that it has a lawsuit pending with Tennessee Tufting Co. That this corporation does not attempt to adopt, accept or receive any of the liabilities under that lawsuit, and that it is not included in anyway in this corporation. The "pending lawsuit" petitioner's new corporation did not want to adopt, accept, or receive involved a roof installed by petitioner for the Tennessee Tufting Corporation in 1968. In early 1972 petitioner learned that the roof it had installed for Tennessee Tufting had split down its entire length. Despite the clear reference found in Donelson's corporate minutes, at trial petitioner repeatedly denied he was aware he would be sued in connection with the split roof until papers were actually served on him sometime in 1973. The lawsuit in question eventually resulted in a 1979 state court decision against petitioner, Donelson, and three other defendants granting Tennessee Tufting $215,000 in damages. Petitioner's share of that liability was approximately $71,000. *573 Petitioner's sole proprietorship had reqularly advanced small sums to its employees which were subsequently deducted from their paychecks. These advances and paybacks were grossed and recorded each month in an account titled "Accounts Receiveable - Employees" (hereinafter "AR-E"). During the 2-1/2 years prior to incorporation, January 1970 to June 1972, the maximum amount charged to the AR-E account in any one month was $623.22. After incorporation, Donelson carried over the AR-E account unchanged. However, petitioner, as Donelson's president, began authorizing larger withdrawals for his personal benefit and charging them to the AR-E account. These larger withdrawals were separately noted in the AR-E account ledger, while the ordinary employee advances on pay were simply entered in gross as before. In 1972, a year not in issue, Donelson charged to the AR-E account three separate payments made to "Harley Holt" totaling $3,093.46. "Harley Holt" is the name of a local retail furniture dealer. All payments to Harley Holt charged to the AR-E account were for furniture purchased with Donelson funds for petitioner's personal use. At trial, petitioner could not recall any details *574 about particular purchases. The AR-E account ledger for 1973 shows the following disbursements as having been other than regular employee advances: Entry Date
Notation
Amount
1-31
Carl Smith
$5,750.20
2-28
"Debby"
6,676.22
4-30
harley Holt
2,382.30
6-30
Howard's
560.55
6-30
Harley Holt
2,314.95
10-31
Harley Holt
2,000.00
10-31
"Either 941 or
6,244.18
1040 taxes"
11-30
Harley Holt
3,000.00
Payments to Harley Holt Furniture on petitioner's behalf in 1973 totaled $9,697.25. The $5,750.20 disbursed to Carl Smith, petitioner's son and a Donelson employee, represents a loan evidenced by a demand note without interest dated February 9, 1973. The $6,676.22 disbursed to "Debby" was a loan made to petitioner's daughter and son-in-law. This loan was also evidenced by a noninterest-bearing demand note. Neither of these loans has been repaid. The amount paid to "Howard's" is unexplained and is not in issue. Petitioner has stipulated that Donelson's payment of $6,244.18 in taxes was made on his behalf; thus, total payments charged to the AR-E account for petitioner's benefit in 1973 were $15,941.53. In 1974 the following entries in the *575 AR-E ledger were specially noted: Entry Date
Notation
Amount
3-31
Harley Holt
$1,500.00
4-30
R. Smith
3,300.00
9-30
Mid-Tenn Ford
6,795.33
At trial, petitioner stated the payment to Mid-Tenn Ford was for a truck used by Donelson, but he ws unable to explain why such a purchase had been entered in the AR-E account. The 1974 payments to Harley Holt Furniture and to "R. Smith," namely petitioner, were both made for petitioner's personal benefit and totaled $4,800. Thus, the total amount distributed to petitioner and charged to the AR-E account between 1972 and 1974 was $23,834.99. In addition to the items listed in the AR-E account, in 1974 Donelson purchased a $209.10 airline ticket for one of petitioner's relatives, and petitioner concedes that amount to have been a constructive dividend to him. No collateral was ever pledged and no notes were ever executed by petitioner with respect to his withdrawals charged to the AR-E account. Donelson's balance sheets for 1973 and 1974, filed as part of its Federal income tax returns, do not show any amounts listed as "Loans to stockholders." [3] No interest was demanded by Donelson or paid by petitioner or *576 anyone else with respect to amounts carried as advances on the AR-E account. Petitioner's balance in the AR-E account was never reduced to reflect amounts paid back, and petitioner's pay was never reduced by credits to the AR-E account.The total balance in the AR-E account recorded as being owed to petitioner's sole proprietorship on June 30, 1972, just prior to incorporation, was $1,698.44. The balances in the AR-E account of Donelson at the ends of 1972, 1973, and 1974 were $6,030.03, $36,076.52, and $47,346.85, respectively.[4]
*577 Petitioner's payment record as a debtor was very good, and he was considered an excellent credit risk by his bankers. However, it is impossible from the record to accurately evaluate his net worth. Petitioner's home was pledged as collateral by a series of deeds of trust to secure loans which provided working capital for his sole proprietorship and, later, Donelson. It is unclear from the record whether these loans were cumulative or "rolled over," and the total debt secured cannot be determined. The value of petitioner's stock interest in Donelson is also subject to doubt because more than one-third of Donelson's net assets in 1973 and 1974 consisted of items carried on the AR-E account. Further, petitioner and, as a transferee, Donelsons were both subject to potential judgment liability involving the Tennessee Tufting Corporation roof failure. Donelson was consistently cash poor. The balance sheets filed with Donelson's Federal income tax returns show it had year-end cash balances of minus $2,362.13 and minus $7,643.75 for 1973 and 1974, respectively. Donelson's monthly bank statement for February 1974 shows Donelson ended the month of January with its checking account *578 overdrawn by $888.56. This overdraft was resolved on February 1, 1974, by a deposit which, after other checks are considered, left a balance of $463.85. On February 4, 1974, petitioner deposited $4,050.10 into Donelson's checking account using funds he had obtained from Lincoln American Life Insurance Co. by cashing in an insurance policy on his life. On February 6, 1974, a check for $3,661.55 was cashed on Donelson's account which, along with other checks and deposits that day, left a balance of $281.19. [5] The balance column of the bank statement shows that without the February fourth deposit, Donelson's checking account would have been overdrawn on the sixth and would have remained so until February 15, 1974. In fact, Donelson's account was again overdrawn despite the February fourth deposit on February 14, 1972. At trial, petitioner stated he had cashed in his life insurance policy to pay back some of the money he had borrowed to buy furniture. He testified that he told his bookkeeper, "Now I borrowed money [from] this corporation, I'm going to deposit this [$4,050.10] in the corporation *579 checking account to pay back some of the money I borrowed." However, the deposit was initially recorded erroneously as a receipt of income and was never credited to the AR-E account as a loan repayment. Petitioner had no idea how, if at all, the deposit was eventually treated on Donelson's books. Donelson has never declared or paid formal dividends. During each of the years in issue, the amounts of Donelson's earnings and profits were at least as large as the corporate distributions made on petitioner's behalf and charged to the AR-E account. In his statutory notice of deficiency, respondent determined that petitioner and his wife received informal dividends from their corporation in 1973 and 1974 of $12,703.21 and $5,009.10, respectively. Respondent allowed total 1973 distributions by Donelson on petitioner's behalf of $15,941.53 to be reduced by the $3,238.22 note owed petitioner by Donelson. [6]
OPINION Donelson, a corporation owned by petitioner and his wife, made substantial distributions on petitioner's behalf which it recorded on *580 its books as "Accounts Receivable - Employees" in an account ("AR-E") otherwise used to record short-term advances against pay made to employees. The issue in this case is whether such distributions constituted loans or informal dividends. The parties agree that in each year before us Donelson's earnings and profits were greater than the amounts of the distributions Donelson admittedly made on a regular basis for petitioner's benefit. Thus, unless those distributions are shown to be bona fide loans, they represent dividend income to petitioner under sections 301 [7] and 316. , affd. ; , affd. sub nom. ; . The critical question is whether petitioner intended to repay the distributions at the time he, as Donelson's president, authorized them on his own behalf. , *581 affg. a Memorandum Opinion of this Court; , affd. ; . Our inquiry into petitioner's intent is entirely factual and is based on all of the surrounding facts and circumstances. , affg. a Memorandum Opinion of this Court; , affg. a Memorandum Opinion of this Court; ; , affd. per curiam , cert. denied . Moreover, our determination can give little weight to unsupported self-serving testimony, especially where contradicted by contemporaneous written records. See , affg. a Memorandum Opinion of this Court, cert. denied ; ; *582 Respondent argues that at the time petitioner withdrew funds from his corporation, he had no intent to repay the amounts withdrawn. Respondent concludes Donelson's distributions to petitioner were therefore informal dividends and not loans. Petitioner argues the advances were in fact loans. We agree with respondent. Our determination is based on the record as a whole, including the following factors: First, the advances to petitioner which Donelson treated as loans in the AR-E account were not consistently recorded as loans on the other books and records of the corporation. The balance sheets filed as part of Donelson's 1973 and 1974 income tax returns show no amounts listed as "Loans to stockholders." This inconsistent treatment leads us to give even less weight to Donelson's records than is ordinarily the case where the records of a closely-held corporation are entirely under the control of the stockholder-officer also claiming to be a debtor. See ;
Second, no notes were executed by petitioner with respect to his *583 withdrawals, no interest on the alleged loans was ever agreed to or paid by petitioner, and no collateral was ever pledged to secure cumulative debt of $23,834.99. These omissions contrast sharply with the notes Donelson received for its loans to petitioner's children and the interest-bearing note Donelson executed for the loan made to it by petitioner and his wife. See , affg. a Memorandum Opinion of this Court; ;;
Third, petitioner's assertion at trial that he paid back a portion of the loans is simply not credible. His testimony is contradicted by Donelson's contemporaneous records, as indeed were other statements petitioner made at trial. See generally ;. Petitioner's remarkably precise memory concerning what he told his accountant is unconvincing in light of his inability at trial to recall the details of other transactions *584 in the record he was asked to explain. Furthermore, the circumstances in which petitioner cashed in life insurance, thereby avoiding a substantial overdraft that could have impaired his company's credit and subjected his and its finances to closer scrutiny, strongly suggest an intent unrelated to the repayment of a loan. Overall, it would be difficult at best for us to infer that petitioner intended to repay Donelson's advances when no credible evidence in the record shows any repayments were ever made. ;;
Fourth, we disregard as inconclusive the evidence about petitioner's credit standing, which was offered to establish his ability to repay Donelson's advances. [8] It is true petitioner's credit history was good, but that fact alone can have little bearing on the status of his advances from Donelson, which he was never asked to repay. The other evidence in the record shows that petitioner's house was mortgaged to secure an indeterminate amount of corporate debt and that both Donelson and petitioner were so cash *585 poor that petitioner had to cash in life insurance to keep Donelson's account from being overdrawn. See ;;
Finally, we note Donelson's distributions to petitioner were for regular purchases of furniture and the payment of petitioner's taxes. In the first year and a half on incorporation, petitioner converted more than one-third of his company's net assets into furniture and loans to his children. On brief, respondent suggests petitioner was trying to place his personal and incorporated assets beyond the reach of potential judgment creditors, a contention we need not address. Suffice it to say that petitioner consistently kept Donelson's cash surplus at a minimum by causing his corporation to pay for his purely personal expenses. See ; *586 Compare . But see (2d Cir.), cert. denied . No one of these factors would alone prevent our finding Donelson's advances were intended to create bona fide indebtedness. See, e.g., ; . Taken together, however, the facts speak for themselves. ;;;Simply put, petitioner has not carried his burden of showing Donelson's distributions on his behalf were not dividends. ; We therefore hold petitioner received informal dividends from Donelson in 1973 and 1974 in the amounts determined by respondent. To reflect concessions and the *587 foregoing, Decision will be entered for the respondent.
Footnotes
1. However, according to an account ledger titled "Robert W. Smith, Capital," the sole proprietorship started Juen 30, 1972, with a net value of $71,138.83. Debits that same day of $12,040.61 ("Draw"), $2,680 ("Note"), and $1,000 (unexplained, but equal to Donelson's initial "Capital Stock" account also dated June 30, 1972) show the net value of the company at the close of business to have been $55,418.22. The "Robert W. Smith, Capital" account does show a net balance of $52,238.22 (the amount the November minutes describe as transferred upon incorporation) opposite the date "11-30" [1972]. Such internal contradictions in the record suggest that the paperwork relating to the transfer of assets lagged somewhat behind Donelson's incorporation in July. ↩
2. However, these additional 980 shares of stock were never recorded on Donelson's books nor are they shown on the balance sheets filed as part of Donelson's 1973 and 1974 Federal income tax returns.↩
3. The amounts denominated loans to petitioner and his children were apparently carried on Donelson's balance sheets as assets under the general heading "accounts receivable."↩
4. Thus, the total increase in the AR-E account over the two years dec. 31, 1972, to Dec. 31, 1974, was $41,316.82.The total (petitioner's and others') of all specially noted charges to the AR-E account over the same two-year period was $40,523.73. These figures indicate that nearly all of the net increase in the AR-E account over the two years in issue was the result of specially noted items. To put these figures in perspective, we note that on June 30, 1972, just prior to incorporation, the AR-E account of $1,698.44 constituted 3.25 percent of the sole proprietorship's net book value of $52,238.22 (or a lesser percentage of the June 30th values described in note 1, supra↩). On Dec. 31, 1973, the AR-E account of $36,076.52 constituted 37.88 percent of Donelson's net book value of $95,243.23; and on Dec. 31, 1974, the AR-E account was 37.65 percent of a net book value of $125,770.86.
5. The date on which the February sixth check was written is not in the record.↩
6. Respondent did not treat any part of this note as having been repaid by the $3,093.46 Donelson advanced to petitioner in 1972.↩
7. All section references are to the Internal Revenue Code of 1954, as amended.↩
8. See, e.g., ; , affd. on another issue .↩